**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 14-cv-00703-CMA

JOSHUA D. L. WIRTH,

    Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

    Defendant.

---

**ORDER AFFIRMING ALJ'S DECISION DENYING SOCIAL SECURITY BENEFITS**

---

This matter is before the Court on review of the Commissioner's decision to deny Plaintiff Joshua D.L. Wirth's ("Plaintiff's") application for social security disability benefits and supplemental security income, under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-33. Jurisdiction is proper under 42 U.S.C. § 405(g).

## I. BACKGROUND

Plaintiff filed an application for disability benefits, as well as an application for supplemental security income, alleging a disability onset date of July 1, 2009. Plaintiff was born in 1983, and was 25 years old on the date of his alleged disability onset and 29 years old on the date of the ALJ's decision. (AR at 223, 230.)[1] After his initial

---

[1] Citations to the Social Security Administrative Record, which is found at Doc. # 14, will be to "AR" followed by the relevant page number.

application was denied, Plaintiff requested a hearing, which was held before an Administrative Law Judge ("ALJ") on October 17, 2012. (AR at 27.)

### A. Plaintiff's Evidence of Disability

At his hearing before the ALJ, Plaintiff testified that he was a part-time student at the University of Northern Colorado ("UNC"), after a four-year hiatus from UNC (described below). (AR at 49-50, 56.) At the time of the hearing, Plaintiff was taking three English courses and working as a dishwasher at a UNC cafeteria for an average of 20 hours a week.[2] (AR at 47-49, 55.) Plaintiff stated that he was able to work additional shifts (approximately 10 additional hours per week) during two of his final exam weeks because he finished final exams earlier than other students. (*Id.*)

Plaintiff testified that he also attended UNC from May of 2005 until he dropped out in the spring of 2007 due to depression. (AR at 49-50, 63, 711.) In the interim period between dropping out of UNC and re-enrolling, Plaintiff attended a trade school and took welding classes, and he was ultimately able to obtain a welding certification. (AR at 50-51.) Plaintiff testified that he needed to stop welding and did not obtain work in the field because he was "having shakes" in his hands. (AR at 51.) He also took three computer classes, but failed two of these classes because he couldn't keep up with the class projects. (AR at 52-53.) Beginning in July of 2008, Plaintiff worked as a full-time security guard at a local mall. (AR at 59.) Plaintiff was "asked to resign" about a year later, after being assaulted by a 14-year-old patron on the mall's property,

---

[2] This was a "work-study" job, which required that Plaintiff remain a student. (AR at 296.)

because, in Plaintiff's words, he "didn't take the proper procedure in trying to detain" the assailant.  (AR at 60-61.)

Plaintiff subsequently re-enrolled at UNC in May of 2011, beginning with the school's summer session.  (AR at 49.)  In his more recent tenure at UNC, he withdrew from several courses or finished them with an "incomplete," although at least two of his Professors offered to allow him to re-take their classes.  (AR at 53, 56.)  Plaintiff testified that he was trying to obtain a four-year English liberal arts degree, but that he was planning on speaking with a career counselor to seek a degree requiring less reading because he was falling behind in his reading assignments.  (AR at 54-55.)

When the ALJ asked Plaintiff how he felt about his dishwashing job at UNC, he stated, "[i]t's a fairly enjoyable work environment.  It's simple, and I'm able to keep up well enough for them to keep me on staff."  (AR at 54.)  Plaintiff stated, however, that he has trouble staying employed despite being able to find work, because "I have yet to find a means of handling my emotions.  When things are down, I feel really down, more than what I should be feeling.  And it does affect my work abilities."  (AR at 63.)  Previously, Plaintiff worked as a cashier at a fast food restaurant for 8 months, but left because the pace was too demanding; he also worked as a "cart pusher" at a Wal-Mart, but left after two months, because he found the work "demeaning."  (AR at 715.)

The ALJ also asked Plaintiff about his day-to-day life; Plaintiff testified that he was able to cook, do laundry, clean, rake leaves, care for cats, drive, and grocery shop. He also testified that he enjoyed watching television and movies, reading, writing,

programming computers, using computers (including making templates for letters and graphs for budgets), and had a good memory for movie scenes.  (AR at 82-89.)

Plaintiff initially alleged, in his September 2010 application for benefits, that he became disabled due to depression, a learning disability, a "medical decision pending for autism," and various physical impairments.[3]  (AR at 260.)

In November of 2006, after being referred to UNC's counseling services by his English professor, Plaintiff saw psychologist Rik D'Amato, Ph.D.  (AR at 699.)  Dr. D'Amato performed a Neuropsychological Evaluation of Plaintiff, which included an intelligence test.  (AR at 703.)  Plaintiff scored in ranges which Dr. Amato characterized as "low average" to "very superior," and he attained a Global Assessment of Functioning (GAF) score of 65, indicating that he had mild mental health symptoms but is "generally functioning pretty well."  (AR at 703, 708); *see also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1165 n.1 (10th Cir. 2012) (describing the GAF system and the meaning of a score in the 61-70 range).  Dr. D'Amato diagnosed Plaintiff with "major depressive disorder, single episode, moderate," "disorder of written expression," and "educational problems." (AR at 708.)  He recommended that Plaintiff (1) see an individual counselor and specifically referred him to the UNC Counseling Center ("where counseling may be obtained for a small fee per semester"); (2) seek treatment from a primary care physician; (3) seek help from UNC's Disabilities Support Services; and (4) join a campus club, group, or organization (AR at 708-09.)

---

[3] Plaintiff had two heart surgeries for congenital heart defects, when he was 4 and 16 years old, as well as a leg lengthening procedure when he was 17.  (AR at 65-66.)  These impairments are not at issue on appeal.

In July of 2008, psychologist Holly May, Ph.D., performed testing to determine Plaintiff's reading comprehension and his vocabulary. (AR at 716-18.) Dr. May assessed Plaintiff's abilities at about the 18th grade level (i.e., those of a second-year graduate student). (*Id.*) Dr. May's Educational Evaluation Report noted that "less than 20% of individuals with similar levels of college education would perform as well [as] or better" than Plaintiff. (AR at 717.) Additionally, Dr. May opined that Plaintiff's relative written language difficulties could be ameliorated by his "strong cognitive and overall academic skills." (*Id.*) As for his work abilities, she stated that

> Mr. Wirth is a bright, articulate and capable young man who may need to adjust his expectations in the workplace. . . . His extremely limited level of experience will result in entry level position which he may not find initially challenging. His personal challenge needs to be in developing a consistent work history. . . . Due to Mr. Wirth's tendency to be meticulous and somewhat anxious, positions that demand a quick pace may not be a good match.

(AR at 718) (emphasis added). Dr. May recommended that Plaintiff seek mental health counseling, and that if he wished to re-enroll in school, that he carry a part-time course schedule and access the services of the Disability Access Center at UNC. (*Id.*)

Between July and November of 2010, psychologist Kathy Rickard, Ph.D., performed longer-term testing and assessment of Plaintiff. (AR at 357.) Dr. Rickard's testing indicated that Plaintiff's "cognitive functioning was in the superior range," (AR at 377), and that that Plaintiff had "very superior" verbal comprehension, "high average" perceptual reasoning, and "average" working memory and processing speed (AR at 363.) Ultimately, Dr. Rickard ruled out an autism-spectrum disorder, but diagnosed Plaintiff with attention deficit hyperactivity disorder (ADHD) and dysthymia, a chronic

form of depression. (AR at 378-79.) Dr. Rickard also assigned Plaintiff a GAF score of 65. (AR at 379.) She noted only that Plaintiff "has had significant trouble with finding and maintaining consistent employment that appears to be related to his history of impulsively quitting and oppositionality to authority." (AR at 377.) Dr. Rickard recommended that Plaintiff (1) visit a primary care physician to determine if medication could improve his ADHD symptoms, (2) meet with school counselors regarding any disability services which might be open to him, and (3) seek help from a therapist for his depression. (AR at 379-80.)

In December 2010, Mark Suyeishi, Psy.D., reviewed the evidence of record and noted that Plaintiff "does demonstrate some poor and uneven performance in academic areas and has been unable to maintain ongoing employment. However, this does not appear to be significantly caused by his concentration, persistent [sic] or pace. . . [and] his basic concentration and attention are intact. . . . [Plaintiff] is likely to have moderate difficulties interacting with others and accepting criticism from supervisors." (AR at 151.) Dr. Suyeishi also concluded that Plaintiff "does not demonstrate any severe impairment in the areas of understanding, remembering and completing tasks," and that he is "capable of skilled work with limited interaction with others." (*Id.*) Specifically, Dr. Suyeishi opined that Plaintiff "retains the mental ability to do work not involving significant complexity or judgment; can do work requiring up to 3 months to learn techniques, acquire information and develop facility needed for an average job performance." (AR at 156-57.)

In May of 2012, Plaintiff underwent an EEG test, which was interpreted by Steve Willson, a Licensed Professional Counselor. Although Mr. Willson's report is not the model of clarity, he seemingly concluded that Plaintiff was "struggling with the effects of a moderate Traumatic Brain Injury." (AR at 791.) Mr. Willson recommended that Plaintiff "seek a Neuro-Psychological Evaluation and look for a support referral through a brain injury treatment program to increase compensatory skills." (*Id.*)

Plaintiff's EEG test results were also reviewed by Dr. Mark Himes, DO, in March of 2013, in a report he submitted to the Appeals Council. In his report, Dr. Himes noted that it would be "very difficult" for Plaintiff to sustain employment "given his current magnitude of problems in higher executive functioning and concentration and attention and affective deficits that he clearly has at this point." (AR at 839.) He also stated that he had reviewed Mr. Willson's report, and "did not see in the record a definitive traumatic brain injury assessment. In reviewing the records I did not see a CT scan or MRI evidence of any structural abnormalities. The reports are simply not available. I would anticipate that those studies would show a grossly normal CNS structure. Certainly from the clinical perspective I do not see anything to suggest that he has a neurosurgical problem." (AR at 836.)

### B. The ALJ's Decision

Under the Social Security Act, a claimant is disabled if he is unable to do "any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). The Social Security Administration uses a five-step

framework to determine whether these conditions are met.  *See* 20 C.F.R. § 416.920. Step one requires the agency to determine whether a claimant is "presently engaged in substantial gainful activity."  *Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004).  If not, the agency proceeds to consider, at step two, whether a claimant has "a medically severe impairment or impairments."  *Id.*  An impairment is severe under the applicable regulations if it significantly limits a claimant's physical or mental ability to perform basic work activities.  *See* 20 C.F.R. § 404.1521.  At step three, the ALJ considers whether a claimant's medically severe impairments are equivalent to a condition "listed in the appendix of the relevant disability regulation."  *Allen*, 357 F.3d at 1142.  If a claimant's impairments are not equivalent to a listed impairment, the ALJ must consider, at step four, whether a claimant's impairments prevent her from performing her past relevant work.  *See id.*  Even if a claimant is so impaired, the agency considers, at step five, whether she possesses the sufficient RFC to perform other work in the national economy.  *See id.*

The ALJ did not dispute that Plaintiff suffered from mental limitations including ADHD and depression/dysthymic disorder, finding that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR at 24).  He did, however, conclude that "the claimant's statements concerning the **intensity, persistence, and limiting effects** of these symptoms are not entirely credible," and pointed to Plaintiff's medical reports and test results (including from both within and prior to the period in which Plaintiff alleged he was disabled), Plaintiff's educational history, and Plaintiff's own statements about his capabilities and

daily life. (*Id.*) (Emphasis added.)  The ALJ noted that he gave "great weight" to Dr. May's report "indicating [Plaintiff] has good functional abilities, but that he is not suited for work requiring a quick pace, as it is supported by the record as a whole," and he gave "significant weight" to the opinion of Dr. Suyeishi.  (AR at 25.)  "Little weight" was conferred to the opinion of Dr. Willson.  (*Id.*)

Specifically, in applying the sequential evaluation process outlined in 20 C.F.R. §§ 404.1520 and 416.920, the ALJ determined that:

1. Plaintiff had not engaged in substantial gainful activity since his alleged onset date of July 1, 2009 [Step 1];

2. Plaintiff had the following severe impairments: congential heart defect status and depression/dysthymic disorder; and ADHD [Step 2];

3. Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 [Step 3];

4. Plaintiff had the residual functional capacity ("RFC") "to perform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). . . . He is able to perform jobs requiring no more than three months to learn technique[s] in a work environment free of fast-past production requirements, involving only simple work-related decisions and routine workplace changes." [Step 4];

5. The claimant is unable to perform any past relevant work; nevertheless, considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform [Step 5].

The ALJ noted that the Vocational Expert who testified at Plaintiff's hearing concluded that, notwithstanding Plaintiff's limitations, he would be able to perform the requirements

of SVP 2,[4] light-exertion occupations, such as a sales attendant (25,000 jobs exist in the state and 1.348 million exist nationally), a housekeeper (14,000 jobs exist in the state and 878,000 exist nationally), or a photocopy machine operator (1,200 jobs exist in the state and 94,000 exist nationally).[5]  (AR at 16.)

Plaintiff requested that the Appeals Council review the ALJ's decision, which it declined to do.  (AR at 1-3.)  On July 30, 2013, Plaintiff filed his appeal of the Commissioner's final decision.  (Doc. # 1.)  Plaintiff filed his opening brief on July 28, 2014, the Commissioner responded on September 3, 2014, and Plaintiff replied on October 3, 2014.  (Doc. ## 20, 23, 24.)

## II. **STANDARD OF REVIEW**

The Court reviews the Commissioner's disability decision to determine whether the ALJ applied the correct legal standard and whether the decision is supported by substantial evidence.  *See Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  It requires more than a scintilla, but less than

---

[4] SVP stands for "Specific Vocational Preparation," and refers to the amount of time required by a typical worker to learn the techniques, acquire the information, and develop the facility required for average performance of a job.

[5] Plaintiff argues, for the first time in his Reply brief, that "The jobs cited by the [vocational expert] . . . would likely require at least occasional social interaction with the public, supervisors, and co-workers, for example. A moderate limitation in social functioning would significantly erode the numbers of jobs and probably knock out sales attendant and photocopy machine operator which involve public interaction to a significant degree." (Doc. # 24 at 2-3).  Because this argument is raised for the first time in Plaintiff's Reply, it is disregarded.  *See United States v. Redcorn,* 528 F.3d 727, 738 n. 4 (10th Cir. 2008) (internal quotation omitted) ("Issues not raised in opening brief are deemed abandoned or waived").  In any event, as described below, the ALJ properly concluded that Plaintiff's social limitations were mild.

a preponderance.  *Id.* (citing *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)).  Evidence is not "substantial" if it is overwhelmed by other evidence in the record.  *Grogan v. Barnhart*, 399 F.3d 1257, 1261-62 (10th Cir. 2005).  In so reviewing, the Court may neither reweigh the evidence nor substitute its judgment for that of the agency.  *Salazar v. Barnhart,* 468 F.3d 615, 621 (10th Cir. 2006); *see also Adams ex rel. D.J.W. v. Astrue*, 659 F.3d 1297, 1301 (10th Cir. 2011) (noting that a reviewing court "may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice.")

### III.  ANALYSIS

Plaintiff raises two arguments in support of his contention that the ALJ erred in rendering his decision:  (1) The ALJ failed to properly assess the medical evidence in determining Plaintiff's Mental RFC; and (2) the ALJ failed to properly apply SSR 11-2p, a regulation providing guidance for ALJs in evaluating evidence of disability in the cases of "young adult" claimants.   The Court addresses each argument in turn.

**A.    WHETHER THE ALJ ERRED IN PROPERLY ASSESSING THE MEDICAL EVIDENCE IN DETERMINING PLAINTIFF'S MENTAL RFC**

Plaintiff contends that the ALJ erred in assessing the medical evidence in fashioning his mental RFC because he (1) failed to account for the moderate limitations in Plaintiff's social functioning found by Dr. Suyeishi (Doc. # 20 at 11), (2) essentially "ignored" the opinions of Dr. Rickard and D. D'Amato (*id.* at 15), and (3) erred in discounting the EEG opinion of Mr. Willson (*id.* at 16).  He also contends that the Appeals Council erred in failing to consider new evidence and failing to remand Plaintiff's case for additional evaluation and findings.  (*Id.* at 17.)

An ALJ must make specific RFC findings based on all of the relevant evidence in the case record. *See Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir.1996); SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996). Those findings must be supported by substantial evidence. *See Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999). "An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." *Chapo v. Astrue*, 682 F.3d 1285 (10th Cir. 2012). At the same time, "an ALJ is not required to discuss every piece of evidence," and an ALJ's opinion must only discuss the uncontroverted evidence he or she chooses **not** to rely upon and any significantly probative evidence he or she **rejects**. *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). Moreover, when the medical evidence does not contradict the ALJ's conclusion, "the need for express analysis is weakened." *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004).

Here, the ALJ explicitly stated that he gave "significant weight" to the opinion of "the State agency psychological consultant[]," i.e., the opinion of Dr. Suyeishi (AR at 25.) Plaintiff argues that despite this "significant weight," the ALJ did not actually properly account for Dr. Suyeishi's findings of moderate adaptation and social functioning limitations. (Doc. # 20 at 11.) However, Dr. Suyeishi's opinions on the impact of Plaintiff's limitations in social functioning were entirely consistent with the ALJ's determination of Plaintiff's mental RFC. Dr. Suyeishi concluded that Plaintiff had moderate limitations in social functioning; however, he – like the ALJ – determined that the Plaintiff's allegations regarding the severity and the impact of these limitations on Plaintiff's ability to work were not credible. (*Compare* AR at 21, 23-24 *with* AR at 154.)

Additionally, the ALJ properly considered Plaintiff's moderate limitations in social functioning and the extent to which they affected Plaintiff's mental RFC when he stated that Plaintiff's "activities of daily living are not consistent with a totally disabled individual," because Plaintiff was able to socialize productively with others – including visiting coffee shops with friends, participating in longboarding competitions and weekly Paganism meetings, and having a girlfriend (AR at 24.)   Thus, drawing on the entire record, the ALJ adequately explained the basis for his conclusion that Plaintiff had mild, rather than moderate, limitations, and adequately accounted for these limitations in determining that he could perform jobs requiring no more than three months to learn in a work environment free of fast-past production requirements, involving only simple work-related decisions and routine workplace changes.  (AR at 21.)[6]  Therefore, the Court disagrees that the ALJ failed to account for the moderate limitations identified by Dr. Suyeishi.  As such, this case is distinguishable from *Haga v. Astrue*, in which the Tenth Circuit held that an ALJ should explain why he or she rejects some moderate restrictions while adopting others.  482 F.3d 1205, 1208 (10th Cir. 2007).

Plaintiff also argues that the ALJ erred in failing to assign a particular weight to Dr. Rickard's and Dr. D'Amato's reports, contending that this was equivalent to ignoring these reports' "**substantive content** as medical opinion evidence on the issue of MRFC and associated work limitations" (*Id.* at 15, 16) (emphasis added).  Nevertheless, the

---

[6] In a related argument, Plaintiff contends that the ALJ erred in posing hypotheticals to the Vocational Expert (VE) because he did not include these "moderate" social limitations in his hypotheticals.  Because the ALJ properly concluded that Plaintiff's social functioning limitations were mild, not moderate, the hypothetical questions he posed to the VE were appropriate.  *See Qualls v. Apfel*, 206 F.3d 1368, 1373 (10th Cir. 2000) (holding that an ALJ's hypothetical question to a VE is sufficient when it matches the limitations ultimately included in the residual functional capacity assessment).

ALJ was not required to assign an explicit weight to the doctors' reports because he made it clear that he agreed with their conclusions (i.e., that Plaintiff had ADHD and depression) (AR at 24).  These same reports (as well as the other evidence in the record) further supported his conclusion that Plaintiff's impairments **were not so severe** as to result in a disabling condition.  (*Id.* at 23); *see also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1163 (10th Cir. 2012) (holding that when a medical opinion is generally consistent with the ALJ's RFC finding, remand is not required merely because the ALJ did not assign a specific weight to the opinion).

In particular, the ALJ pointed to the fact that numerous intelligence tests and academic evaluations, including Dr. Rickard's and D. D'Amato's, demonstrated that Plaintiff has above-average, even superior, cognitive abilities in many areas of functioning.  (AR at 23-24).  The ALJ also considered the fact that Plaintiff required little treatment and had not actually obtained medication (or other forms of longer-term treatment) for his ADHD or depression – despite numerous recommendations to do so.[7] (AR at 24.)  The ALJ noted that Plaintiff achieved considerable educational success (in earning his high school diploma, two associates degrees with a high GPA, and a welding certificate; and taking some upper-level courses at UNC).  (AR at 25).  Moreover, the ALJ noted that Plaintiff worked part-time as a dishwasher while attending UNC, worked as a security guard for more than a year (and was asked to resign for job

---

[7] Plaintiff's doctors repeatedly recommended he meet with a cardiologist prior to obtaining ADHD medication and that he attend therapy or counseling for his depression (AR at 379-80, 481-82).  It seems, however, that Plaintiff never actually followed up on those recommendations – he saw Mr. Willson, a Licensed Professional Counselor, on a handful of occasions (but for brain imaging analysis, not therapy), and he did not follow up as to ADHD medication (AR at 68, 76-78, 793).

performance, not impairment-related, reasons), and "testified that he is staying in school because he has student loans and the only jobs he can find do not pay him enough to for him to pay back his loans . . . an admission that [he] can perform work." (*Id.*) Consequently, there was sufficient evidence in the record for the ALJ to reasonably conclude that Plaintiff's mental impairments did not rise to the level of a disabling condition.

The Court is similarly unpersuaded by Plaintiff's argument that the ALJ erred in discounting Dr. Willson's Report. The ALJ explained that he assigned "little weight" to Dr. Willson's findings because (1) "some of his conclusions fall outside the expertise of his practice," (2) his findings were not supported by the record as a whole, which showed minor mental limitations only, and (3) he had treated Plaintiff for a less than a month at the time of the report. (AR at 25.) Mr. Willson's lack of expertise in the area of EEG analysis and his abbreviated treatment duration were valid reasons for the ALJ to confer less weight on Mr. Willson's opinion, as was the fact that Mr. Willson's conclusions were not supported by the record as a whole. *See* 20 C.F.R. § 404.1527(c)(2)(i), (4), (5) (noting that opinions contradicting the record, rendered by sources outside of their area of specialty, or by sources with a short-lived treatment relationships generally merit less weight); *Hollenbach v. Barnhart*, 71 F. App'x 813, 818 (10th Cir. 2003) (noting that an ALJ did not err in discounting a medical source's opinion when "his opinion was contrary to the evidence; he provided little treatment or evaluation of claimant's . . . condition; and he was a family practitioner with no specialty in orthopedics.")

Although Plaintiff contends that the Appeals Council failed to consider Mr. Willson's "extensive training for EEG analysis" and points to his C.V. (which contains listings of several 20-hour "Certification Programs" on "Fundamentals in Brain Functional Imaging," taken yearly in 2003, 2004, and 2005), it is undisputed that Mr. Willson is a Licensed Professional Counselor with no history of medical training; accordingly, he is not an "acceptable medical source." *See* SSR 06-03P (noting that counselors are "non-medical sources"). Thus, Mr. Willson's C.V. (providing corroboration that he lacks medical training) does not contradict the ALJ's decision to assign Mr. Willson's opinion less weight than the other medical sources. *Id.* (noting that it is justified for an ALJ to give an "acceptable medical source" greater weight than a non-medical source, because medical sources "are the most qualified health care professionals.")

Plaintiff argues that, even if Mr. Willson's findings did not constitute evidence of disability in and of themselves, remand is appropriate because "the concensus [sic] of the medical sources of record is that Mr. JW needs further evaluation." (Doc # 20 at 14). However, Plaintiff addressed any unanswered questions which might have been raised by Mr. Willson's report by having Dr. Himes's – a neurologist – conduct a consultative examination which to review Mr. Willson's report, the results of which were reviewed by the Appeals Council.[8] Indeed, Dr. Himes disagreed with Mr. Willson and

---

[8] The Appeals Council noted that it considered both Dr. Wilson's C.V. and as Dr. Himes' Report as additional evidence which it made part of the record (AR at 6.) Although it did not provide further explanation of the effect of the C.V. and the report on the Council's analysis of the ALJ's decision, such analysis is not required when the Appeals Council denies review. *See Martinez v. Barnhart*, 444 F.3d 1201, 1207-08 (10th Cir. 2006).

concluded that Plaintiff likely did not have a brain injury.  (AR at 836.)  Accordingly, Dr. Himes's report demonstrates that remand of this case for further examination would be futile – as does the near-consensus in opinions as to Plaintiff's diagnoses of ADHD and depression by the many doctors who evaluated Plaintiff over the course of several years.  *See Thompson v. Colvin*, 551 F. App'x 944, 948 (10th Cir. 2014) ("A remand for the ALJ to weigh opinions that admittedly do not support a finding of disability would be futile.").

Additionally, although Dr. Himes did conclude that "it would be very difficult" for Plaintiff to sustain employment at the time Dr. Himes saw him due to his difficulty with concentration and attention (AR at 839), this finding does not require remand either. The ALJ accounted for such limitations in deciding that Plaintiff could perform jobs "in a work environment free of fast-past production requirements, involving only simple work-related decisions and routine workplace changes."  (AR at 21-22.)  Moreover, Dr. Himes was a neurologist, not a vocational expert.  *See Cowan v. Astrue*, 552 F.3d 1182, 1189 (10th Cir. 2008) (treating physician's statement that he did not know if the clamant would ever be able to return to work was "not a true medical opinion," where it did not contain the doctor's judgment about the nature and severity of the claimant's limitations or any information about what activities the claimant could still perform, and instead merely addressed an issue reserved to the Commissioner).

In sum, the ALJ properly evaluated the medical evidence in making his RFC findings, these findings are supported by substantial evidence in the record, the Appeals

Council did not err in concluding that Dr. Himes's report was consistent with ALJ's findings, and remand would be futile.

### B. WHETHER THE ALJ ERRED IN FAILING TO APPLY SSR11-2P TO THE EVIDENCE

Plaintiff argues that ALJ should have applied SSR 11-2p, a regulation guiding the evaluation of disability in young adults ages 18 to "approximately 25," as Plaintiff was 25 years old for five months of the relevant period. (Doc. # 20 at 15-16.) SSR 11-2p requires the ALJ consider the same information he would for any adult claimant, including evidence from medical sources, non-medical sources, and education records, as well as any evidence of extra help and accommodations offered to a Plaintiff from parental or educational sources. *Id.* As described above, the ALJ conducted this kind of thorough review here.

Additionally, Plaintiff asserts that he was classified as a "disabled student" and that he "required special support and accommodations" from his teachers and professors, and that the ALJ failed to consider this fact. (Doc. # 20 at 15-16). However, there is no evidence of such accommodations in the record as to Plaintiff's tenure at community college (which was before the alleged onset period, in any case).[9] At UNC, he obtained recommendations from Dr. D'Amato and Dr. May that he could benefit from disability support services (AR at 708, 718), but no evidence he actually availed himself of such services. In any case, the learning-disability-related accommodations suggested by Dr. D'Amato and Dr. May – that he take tests with extended time, focus

---

[9] Plaintiff's brief asserts, without record support, that Plaintiff "has required special support and accommodations in his college career from his teachers at NE Junior college." (Doc. # 20 at 15.)

18

on fewer courses, and develop time management and reading comprehension skills – were entirely consistent with the ALJ's RFC finding that Plaintiff was capable of performing simple work at a moderate pace.   Accordingly, the ALJ properly applied SSR 11-2p.

## IV.  **CONCLUSION**

Accordingly, it is ORDERED that the ALJ's denial of social security disability benefits is AFFIRMED.   Each party shall bear its own costs and attorney fees.

DATED:  December 22, 2014

BY THE COURT:

*(signature)*

_____
CHRISTINE M. ARGUELLO
United States District Judge